

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00417-CV

_____

IN RE: THE COMMITMENT OF JAMES LAWRENCE BROWNING

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV21-03-136

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

After a jury found that Appellant James Lawrence Browning was a sexually violent predator, the trial court signed a final judgment and order civilly committing him. *See* Tex. Health & Safety Code Ann. §§ 841.003, .081. On appeal, Browning raises three issues:

> 1. Is the evidence factually sufficient to support the jury's implicit finding that Browning suffers from a behavioral abnormality, an indispensable element of a sexually violent predator inquiry?
>
> 2. Did the trial court reversibly err by limiting Browning's examination of the venire panelists regarding their capacity to afford him a fair trial in a case involving a child victim?
>
> 3. Did the trial court reversibly err by preventing Browning's expert witness from explaining how her opinion is informed by the legislative findings?

Holding that (1) the evidence is factually sufficient, (2) the trial court did not improperly limit Browning's examination of the venire panel, and (3) the trial court did not err by prohibiting Browning's expert from discussing the legislative findings, we overrule Browning's issues and affirm the trial court's judgment.

## II. OVERVIEW

The statute governing the civil commitment of sexually violent predators states that a person is a sexually violent predator if the person "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a).

Browning does not dispute that the State met the first prong. The evidence showed that (1) in 1985, Browning was convicted of aggravated sexual assault and received a ten-year sentence; (2) in March 1994, Browning was convicted of indecency with a child by contact and received a thirty-five-year sentence; and (3) in July 1994, Browning was convicted of sexual assault and received a thirty-year sentence.

Regarding the second prong, the statutory definition of "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). At the heart of the second prong is the person's ability to control the behavior. *In re Commitment of Gonzalez,* No. 02-21-00238-CV, 2022 WL 1183219, at *9 (Tex. App.—Fort Worth Apr. 21, 2022, pet. denied) (mem. op.), *cert. denied,* 2022 WL 6573224 (U.S. Oct. 11, 2022) (No. 22-5521); *In re Commitment of Thompson,* No. 06-20-00024-CV, 2020 WL 6066205, at *1 (Tex. App.—Texarkana Oct. 15, 2020, pet. denied) (mem. op.).

### III. DISCUSSION

#### A. Factual Insufficiency

In his first issue, Browning claims that the evidence is factually insufficient to support findings beyond a reasonable doubt that Browning (1) is a sexually violent predator, (2) had serious difficulty controlling his behavior at the time of trial, and (3) suffers from a behavioral abnormality that makes him likely to engage in a

3

predatory act of sexual violence. The record, however, contains factually sufficient evidence to support each of the challenged findings.

### 1. Standard of Review

A properly conducted factual-sufficiency review in a sexually-violent-predator case requires the appellate court to determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is a sexually violent predator. *In re Commitment of Stoddard*, 619 S.W.3d 665, 668 (Tex. 2020). When doing so, the appellate court may not commandeer the jury's role of determining the witnesses' credibility and the weight to be given their testimony. *Id.* If a reasonable factfinder could do so, the court presumes that the factfinder resolved disputed evidence in a manner consistent with the finding. *Id.* Finally, if—in light of the entire record—the contrary evidence is so significant that the factfinder could not have made its finding beyond a reasonable doubt, then the evidence supporting the verdict is factually insufficient. *Id.*

Articulated differently, in a sexually-violent-predator case, where the burden of proof is beyond a reasonable doubt, if, in light of the entire record, (1) a reasonable factfinder could not have credited the disputed evidence in favor of the sexually-violent-predator finding and (2) the undisputed facts not supporting the finding are so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met, then the evidence is factually insufficient. *Id.* at 675.

The jury alone judges the credibility of the witnesses and the weight to be given their testimony. *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied). When resolving conflicts and contradictions in the evidence, the jury may believe all, part, or none of the witnesses' testimony. *Id.* Further, from basic facts, a jury may draw reasonable inferences to ultimate facts. *Id.* This remains true even when juries weigh opinion evidence and the judgment of experts. *Kirkpatrick v. Mem'l Hosp. of Garland*, 862 S.W.2d 762, 772 (Tex. App.—Dallas 1993, writ denied); *see David Rafes, Inc. v. Huml*, No. 01-08-00856-CV, 2009 WL 3491043, at *6 (Tex. App.—Houston [1st Dist.] Oct. 29, 2009, no pet.) (mem. op.). The jury decides which expert to believe. *Kirkpatrick*, 862 S.W.2d at 772. "If the jury has evidence sufficient that reasonable minds could differ, we may not substitute our judgment for that of the jury." *Id.*

## 2. Application

### a. Abnormal Behavior

Browning's three offenses themselves illustrated behavior that a rational factfinder could have determined were well outside the bounds of normal behavior, that is, that Browning's behavior was abnormal. Browning discussed his offenses with two psychologists, Dr. Timothy Proctor, who testified on behalf of the State, and Dr. Marisa Mauro, who testified on Browning's behalf. Both experts considered their conversation with Browning and the record when evaluating the nature and implications of Browning's offenses. *See* Tex. R. Evid. 703.

### (1) 1985 Aggravated Sexual Assault

Regarding Browning's first sexual offense (the 1985 aggravated sexual assault), Browning told both Dr. Proctor and Dr. Mauro that he was angry at the victim, Cathy,[1] for not paying him for some work that he had done and that he had wanted to degrade her. According to Browning, Cathy was less than tactful when declining to pay him; laughing at and mocking him did not help. Browning beat her up, grabbed her by the hair, put her on the ground, banged her head against the floor, bit her and left bite marks on her back, choked her, pulled out her pubic hair, forced her to perform oral sex on him, and penetrated her vagina with his penis, causing a laceration on her vagina. Browning had a knife but denied threatening her with it. Cathy, however, had allegedly indicated that Browning had used a knife and had threatened to cut off her breasts or nipples. Finally, during a deposition, Browning stated that hurting her had aroused him sexually.

### (2) March 1994 Indecency with a Child by Contact

Browning's second victim was his ten- or eleven-year-old stepdaughter, Alice. Browning clarified that he was just living with the girl's mother; but the girl called him dad, so he called her his stepdaughter. He acknowledged touching her breasts and touching or penetrating her vagina with his finger "[p]robably twice" with the intent to arouse and gratify his own sexual desire. Alice alleged that she had touched

---

[1]We use a pseudonym to protect the identities of Browning's three victims. *See* Tex. R. App. P. 9.9(a), 9.10(a); 2d Tex. App. (Fort Worth) Loc. R. 7.

Browning's penis, but he asserted that she had not touched him in any way. At the time of the offense, Browning was having sex with Alice's mother and three other women.

### (3) July 1994 Sexual Assault

Browning's third victim was his fourteen- or fifteen-year-old biological daughter, Betty. Browning related that they had sex three times in three different places. Betty put the number of occasions at "up to seven." Regarding the first time, Browning explained, "We went for a ride on a motorcycle. And on the way back, we stopped at the bridge to talk. And we [were] leaning against the bridge, and she put herself in my lap[,] and we went in the woods and had sex." By his estimate, Browning had been estranged from Betty since 1976,[2] but she came to stay with Browning at Browning's suggestion when she was fourteen or fifteen years old. The offenses started occurring within a few weeks after Betty had come back into his life.

Browning denied threatening Betty, but the record indicated otherwise. When asked what kind of threats Browning had allegedly made to Betty, Dr. Proctor responded,

> Threats about blowing [Betty] away, killing her, that -- that he would offend against [Alice] if [Betty] didn't acquiesce, which, of course, he --

---

[2]Browning estimated Betty's age in 1976 initially at six or seven years old, revised it to two years old, and then admitted that he did not know in what year she had been born.

7

he -- he offended against [Alice] anyway.[3]  There's even indications that -- that he had told people that he was -- had traded [Betty] for drugs and that there were other -- another man, at least, that was going to be able to have sex with her because of that.[4]

### b. Recidivism

The evidence showed that incarceration did not dissuade Browning from committing new offenses.  Because mandatory supervision plays a prominent role in this discussion, we first explain what mandatory supervision is.

"Mandatory supervision" means "the release of an eligible inmate sentenced to the institutional division so that the inmate may serve the remainder of the inmate's sentence not on parole but under the supervision of the pardons and paroles division."  Tex. Gov't Code Ann. § 508.001(5).  The release is mandatory and is triggered when the inmate meets certain conditions:

### § 508.147.  Release to Mandatory Supervision

(a)  Except as provided by Section 508.149,[5] a parole panel shall order the release of an inmate who is not on parole to mandatory supervision when the actual calendar time the inmate has served plus any accrued good conduct time equals the term to which the inmate was sentenced.

(b)  An inmate released to mandatory supervision is considered to be released on parole.

---

[3]According to the indictments, the offense against Alice occurred on May 31, 1992, and the offense against Betty occurred about two weeks later, on June 15, 1992.

[4]At trial, Browning denied selling Betty for drugs.

[5]This section is entitled "Inmates Ineligible for Mandatory Supervision."  *Id.* § 508.149.

> (c) To the extent practicable, arrangements for the inmate's proper employment, maintenance, and care must be made before the inmate's release to mandatory supervision.

*Id.* § 508.147. In contrast, parole is a discretionary release: "Parole" means "the discretionary and conditional release of an eligible inmate sentenced to the institutional division so that the inmate may serve the remainder of the inmate's sentence under the supervision of the pardons and paroles division." *Id.* § 508.001(6).

### (1) 1985 Aggravated Sexual Assault

Browning committed the 1985 aggravated sexual assault offense right after discharging his mandatory supervision for a non-sex-related offense, burglary of a habitation. This meant that Browning had already been to prison and had been released when he committed the aggravated sexual assault.

### (2) March 1994 Indecency with a Child by Contact and July 1994 Sexual Assault

And while Browning was on mandatory supervision for the 1985 aggravated sexual assault, he committed the two other sexual offenses. This meant that Browning had already been to prison for a sexual offense when he committed two more sexual offenses.

### (3) Sexual Misconduct While in Prison

Browning had two sexual misconduct cases while in prison, which both experts considered when making their determinations. *See* Tex. R. Evid. 703. The first one

was in 1995, and the second one was in 2007. Both involved indecent exposure. *See* Tex. Penal Code Ann. § 21.08.

### c. Dueling Experts

Dr. Proctor concluded that Browning was a sexually violent predator. Dr. Mauro concluded the contrary, that is, that Browning was not a sexually violent predator. Both Dr. Proctor and Dr. Mauro set out their analyses and were subject to cross-examination. Below are examples of their analyses on Browning's

(1) ability (or inability) to control behavior,

(2) age and its significance,

(3) descriptions of the offenses and their inconsistencies,

(4) insight (or lack thereof),

(5) pedophilic disorder,

(6) indicia of sexually sadistic behavior,

(7) substance-abuse issues, and

(8) impetus for committing the offenses.

Their opinions differed.[6]

---

[6]As pointed out by Browning in his brief, the trial court admitted much of the testimony with the following proviso:

Keep in mind hearsay generally -- normally is not admissible.

So in this case, certain hearsay information that are contained in records or reviewed by an expert can be and is going to be admitted to you through expert testimony. These statements are admitted only for

## (1) Ability (or Inability) to Control Behavior

Dr. Proctor found particular significance in Browning's committing the first sexual offense after having been in prison and on mandatory supervision for the burglary offense and, further, in his committing the last two sexual offenses after serving a prison sentence and while still on mandatory supervision for the first sexual offense. The three sexual offenses showed that Browning had "serious difficulty controlling his behavior." Dr. Proctor also noted that there was a "pattern that the things that typically deter people from reoffending were not successful with him." Elaborating, Dr. Proctor said,

> So as I talked about, emotional capacity deals with your psychological functioning, feelings, emotions, being able to manage, your capacity to manage your emotions. I don't think we really got into it, but volitional capacity is about controlling one's behavior and whether someone has serious difficulty controlling behavior. So, like, when you look at his offending and especially offending after he had already been convicted

---

> the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter in and of itself stated.

The court's jury charge contained a comparable caveat:

> Hearsay is a statement that: 1) the declarant does not make while testifying at the current trial or hearing and 2) a party offers in evidence to prove the truth of the matter asserted in the statement. Hearsay normally is not admissible. In this case, certain hearsay information contained in records reviewed by an expert or experts was admitted before you through expert testimony. Such hearsay was admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted.

*See* Tex. R. Evid. 705(d).

11

of a sex offense once and then he offends not with one victim but a second victim while he's under supervision, that certainly speaks to emotional capacity, but certainly volitional capacity.

Finally, Dr. Proctor observed that Browning's behavior while in prison was not blemish-free: "[T]here were a couple of sexual misconduct cases once he got to prison this last time." Dr. Proctor stated that Browning had eleven major disciplinary cases, twenty-two minor ones, and "another four or so that were major but were reduced to minors." Most of the cases were for not following rules, but a few involved making threats. "But, of course," added Dr. Proctor, "for our purposes, the most striking thing was that there were two sexual misconduct cases." Dr. Proctor explained their significance as follows:

> We're looking at sexual offending. Now, typically the kind of offending you're doing in jail aren't sexually violent offenses. They can be, but it -- it's more often what are called masturbation case, which is where an inmate is masturbating towards a guard for sexual gratification. So that very much gets at someone having serious difficulty controlling their behavior, even in prison they're still engaging in sexual offense behavior, especially if it's, you know, indicated they're -- they're doing it for sexual arousal, they're targeting guards for the purpose of masturbating in their presence. That is very relevant to a behavioral abnormality-type opinion.

The first sexual misconduct occurred in 1995: "So in 1995 there was an incident where he was masturbating at his cell door in public. So, I mean, that's not masturbating in his bed covered up or -- that's standing at the cell door masturbating, so that -- that speaks to somebody who is -- is intending to be seen."

The second sexual misconduct took place in 2007:

12

And then [in 2007] there was . . . a female officer that . . . he had an exchange with where he cussed at her[,] and she was the one who saw him. So that seems pretty clearly to be targeting.

Even more so in '07 there was an incident where a -- an officer came in and -- to his cell. He was in the bottom bunk, and he exposed his penis, had an erection, and began to masturbate his penis toward -- you know, in -- where the officer could see. That, again, is clearly targeting. I mean, he -- the officer was standing right there[,] and [he] pulled out his penis and masturbated, so that would -- that would qualify as well.

Dr. Proctor acknowledged that Browning's conduct improved with time and that Browning's last disciplinary case was in 2007.

In contrast, Dr. Mauro discounted the significance of Browning's two sexual misconduct cases. Although she did not dispute the truth of the allegations, she effectively disputed their relevance:

Q. And you failed to consider the sexual misconducts in prison; is that right?

A. Oh, no, I considered them. I just didn't use them as an index offense.

Q. Okay. And you're aware that the Static[7] manual includes sexual misconducts as an additional charge or index offense if it's the last offense for the index; is that correct?

_____

[7]According to Dr. Proctor, the Static-99R is the most commonly used risk-assessment measure for sexual offending. It was not, however, created specifically for behavioral-abnormality evaluations. Dr. Mauro also used the Static-99R and, additionally, the Static-2002R, which she described as an actuarial instrument that relies on historical data to determine predictive risk. Both Dr. Proctor and Dr. Mauro also used the PCL-R test, which Dr. Proctor said determines general criminal recidivism but, like the Static-99R, was not specifically designed to score for a behavioral abnormality. Dr. Mauro said that the PCL-R "is a historical instrument that measures behavior over the course of the lifetime."

13

A. Yes. I spoke about that on direct.

Q. And you would agree that [Browning] received two disciplinaries for sexual misconduct, right?

A. Yes.

Q. And you would agree that the records stated that he exposed his penis to an officer with, quote, the intent to gratify his sexual desire, right?

A. It says that.

. . . .

Q. And the allegation was that he took out his penis and then stroked it towards that officer; is that right?

A. That's what the officer said, when she's looking in his cell.

Q. And you said you wouldn't consider it unless it would be something illegal in the free world; would you agree with that?[8]

A. Yes.

. . . .

---

[8]Section 21.08 of the Texas Penal Code provides,

**INDECENCY EXPOSURE**

(a) A person commits an offense if he exposes his anus or any part of his genitals with intent to arouse or gratify the sexual desire of any person, and he is reckless about whether another is present who will be offended or alarmed by his act.

(b) An offense under this section is a Class B misdemeanor.

Tex. Penal Code Ann. § 21.08.

Q.  Okay.  So if someone was in their house standing at a window masturbating towards someone for their own sexual gratification, that would be an offense, a sexual offense, correct?

A.  It could, I guess, conceivably.  I've never, you know, seen it, but, you know, if there was an obvious intent there.

Q.  And the other one, he got the disciplinary because he was masturbating at his cell door, which was considered a public place because he wasn't hidden, he wasn't behind anything, he didn't cover himself.  He was standing at his cell door masturbating, right?

A.  That's what it says.

Q.  If someone in the free world was standing at their door in their home and someone was outside, that would be considered exposure; would you agree?

A.  If their door is open.

. . . .

Q.  So if the officer said that [Browning] was masturbating in public where he could be viewed, that would be exposure?

A.  That's the officer's opinion on that in the language in their rule book.  But clinically speaking, I didn't feel that it met the criteria for me to count it on the Static.

Q.  Okay.  And it was more than just an officer's opinion; it was also the finding of TDCJ that he did this intentionally?

A.  Sure.

. . . .

A.  . . .  I'm not saying that I'm not believing the allegations or -- or write-ups.  I'm saying that it doesn't, in my opinion, meet the criteria that is -- that is necessary to count it as an index offense on the -- on the Static.  I don't think that it supports that.  But had I, yes, believed that it

15

did support the requirements to be counted as an index, the score would have risen from a 1 to a 2, which is still very small.

Based on the jury's verdict, Dr. Mauro failed to persuade the jurors that Browning's two sexual misconduct cases while in prison had little or no significance. *See Mullens*, 92 S.W.3d at 887.

### (2) Age and Its Significance

Next, Browning stresses his advanced age (sixty-four at the time of the trial). Both Dr. Proctor and Dr. Mauro took Browning's age into account when performing their analyses—both identified it as a mitigating factor.

Dr. Proctor explained how Browning's age lowered his risk factor significantly yet did not eliminate it:

Q. And so when conducting a behavioral abnormality evaluation, do you typically consider protective factors?

A. Always.

Q. And did you identify any protective factors with Mr. Browning?

A. I did.

Q. Which -- what protective factors did you find?

A. Well, the biggest one is age. As a group, as individuals get older, their risk for reoffense goes down. Obviously[,] it varies individually, but as a group that's true. So one of the things we look at is his age. Also he's enrolled in a sex-offender treatment program. It's the 9-month program. He's still in that program. It's -- it's, you know, not a very lengthy program, but it still has some protective elements certainly.

16

He has some social support, namely an aunt and a brother. He doesn't have a lot of social support, but there's some. That's protective. And then I also noted his increased -- increase probably isn't the best way to say it. His -- his apparent improvement in his behavior more recently that I have mentioned before.

Q. And so I want to talk about -- you said age is a big protective factor for Mr. Browning; is that right?

A. That's right.

Q. And on the Static we even saw that you could lose three points on that; is that correct?

A. Right. I mean, the reason his score is not, you know, pretty significant -- it would be a 5 otherwise, which would be above average -- is because of his age subtracting points.

Q. So even on the Static, just his age does not compensate for all of the other items he got a point for?

A. True.

Q. So he still scores in the positive?

A. That's right.

Dr. Mauro also identified Browning's age as a protective factor, but she identified it as one of many factors and not necessarily as the dominant one:

Q. Did he exhibit any protective factors?

A. Yes. In my opinion, I think he does.

Q. And which ones were present in this case?

A. So, you know, you can look at protective -- well, protective factors for him, some of these are -- are included on the Static, and so I don't want you to think -- I can never predict how somebody is going to think about what I say, of course, and I don't want there to be like a

17

tally.  So I know this is already included on -- on the Static, so it's not like an extra protective factor is what I'm trying to say, but it's age.

So -- so age is -- age is protective, but it's not something that, you know, adds an extra layer of protection or something like that beyond what's already captured by the Static.  It's just clinically speaking and on the Static, age is protective.

He's -- also he's not in -- in -- in the best physical health.  His -- his offense with [Cathy], with the first victim, was pretty aggressive and violent.  I think that he would have difficulty engaging in that type of offending behavior today.  Indeed[,] we haven't seen that type of violence from him in the prison, certainly in a long time.  He's had a few fights in prison, but nothing so violent and not in -- not in many years.

Additional protective factors would be that he's been in -- in remission from his substance use for a long time.  However, I do need to highlight that if he did become intoxicated or under the influence of drugs in the future, that in his specific case I would anticipate that would increase his risk.  But right now he does seem to be in remission.

He does have the support of family.  We know that life stability is -- is important for reducing criminal offending, so he does have support from his brother, possible places to live, possible work, somebody that's going to be able to help house, feed, and clothe him.  That's very important to reduce offending.

He's also got a very significant history of having appropriate adult consensual sexual intimate partner relationships.  That means that he is capable of getting his sexual needs met, which all people have, from an appropriate partner who doesn't need to have a non-consenting or a child sexual partner in order to gratify basic human sexual needs.  He's actually got a pretty lengthy history of girlfriends and wives and things.  He's been able to cohabitate.

Ironically, as between Dr. Proctor and Dr. Mauro, Dr. Proctor appeared to place greater importance on Browning's age as a mitigating factor.  Regardless, neither considered Browning's age dispositive.  Browning nevertheless argues that he is no

18

longer a threat due to his age. Browning explained the scope of his post-release ambitions: "I have a brother[,] and I have an aunt, and I'll be living with my brother out in the country. And all I want to do is sit in the rocking chair. I'm 64 years old. Sit in a rocking chair and drink some tea and just do time."

But as an appellate court, we may not usurp the jury's role in determining the weight to be given the witness's testimony. *Stoddard*, 619 S.W.3d at 668. The experts considered the same evidence and came to different conclusions; the jury decides which expert to believe. *See Kirkpatrick*, 862 S.W.2d at 772.

### (3) Descriptions of the Offenses and Their Inconsistencies

Dr. Proctor was concerned about Browning's inconsistencies:

> You know, [Browning] was saying with both of these [offenses against children] that he very much regretted doing them, had remorse for doing them, but, you know, wouldn't -- but was still minimizing elements of it. But I think that was the thing that stuck out to me. And I guess I would also add . . . how . . . he's been very inconsistent. I mean, even recently really, seemingly from person to person, changing what he said about what actually happened.

At trial, there were many examples of Browning's giving inconsistent answers. Dr. Proctor noted the discrepancy in the number of sexual partners that Browning had reported:

> Well, he said that in the past he had a high sex drive. And then in terms of the sexual promiscuity, he's previously reported having 300 or so sex partners. With me, he said, ["W]ell, it's actually more like 16 or 17. I don't know why I say stuff like that sometimes. Sometimes I just blurt stuff out and it gets me in trouble."

When testifying, Browning put the number at "[p]robably about 30."

19

For Browning, even the number of victims varied. When asked at trial how many victims he had, Browning responded, "Three." But Browning acknowledged that when he was deposed and was asked the same question, he had responded that he had "committed two crimes against two innocent people." He had to be reminded that Cathy was a victim as well.

Along the same lines, Browning stated at his deposition that Betty had initiated the sex at least some of the time. At trial, Browning denied that Betty had initiated any of the sex.

Dr. Mauro did not dispute that Browning had been inconsistent regarding Alice's offense:

Q. And you would agree that his statements regarding the offense against [Alice] ha[ve] been inconsistent throughout the records, would you agree, just his version?

A. Mr. Browning's?

Q. Yes.

A. Oh, yeah. Early on he denied the behavior for which he's been convicted and that he's now admitted.

Q. Would you agree that during his deposition, most of how he spoke about [Alice] was that it was accidental touching, it wasn't intentional, that kind of thing?

A. That's what it seemed like, yes.

Q. Okay. But if yesterday he said it was all intentional and he said that he touched her vagina, touched her breasts, and it was all

20

purposeful, you would agree that that's a great difference between one month to another?

A. It certainly is different. Whether or not, you know, he's accepting full responsibility or calling it accidental, there's some difference there.

While Dr. Mauro did not appear to place any particular weight or significance on Browning's inconsistencies, they represented a red flag to Dr. Proctor. Specifically, those inconsistencies illustrated to Dr. Proctor that Browning still has a problem with impulsivity and control:

> There's, you know, being irresponsible. So, like, not holding down responsible jobs; violating trust in other people, like, you know, offending against the daughter of his girlfriend; impulsivity, very impulsive person, somebody who will say -- I mean, he is the kind who had to just pick up and go, couldn't stay in one place long; makes decisions without thinking; some aggressiveness, including he has an assault charge involving a -- a former wife, some dishonesty.
>
> I mean, really, in the realm of -- of pathological lying, which is lying not just to get out of trouble but just for the sake of lying, like I mentioned when he was talking to me about some inconsistencies of what he had told me with others. ["]It's like, sometimes I just say stuff. I don't know why I say it. It's not true, ends up, you know, kind of coming back to bite me.["] All of those [personality features] are -- are certainly ones that he has.

Inconsistent stories can lend themselves to negative inferences. *See Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at *21 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.); *Hill v. Spracklen*, No. 05-17-00829-CV, 2018 WL 3387452, at *7 (Tex. App.—Dallas July 12, 2018, pet. denied) (mem. op.). A rational factfinder could have determined that these inconsistencies undermined

21

Browning's credibility and, in the process, his trustworthiness. *See Univ. of Tex. Sw. Med. Ctr.*, 2020 WL 5757393, at \*21; *Hill*, 2018 WL 3387452, at \*7. And a rational factfinder could have further concluded that it is a short step from untrustworthiness and deception in speech to untrustworthiness and deception in behavior. *See Mullens*, 92 S.W.3d at 887 (providing that from basic facts, a jury may draw reasonable inferences to ultimate facts).

### (4) Insight (or Lack Thereof)

Dr. Proctor also found troubling Browning's explanation for why he had offended against the two children: "[Browning] said he really didn't know." This nondescript response caused Dr. Proctor concern:

> As far as the [child] victims, you know, one of the things you're wanting to see is someone develop some insight into why they did what they did. You know, if someone is like I don't know why I did it, it -- it's not as big of a risk factor as you might think on the surface, but it is relevant to how well someone's doing in treatment and -- and their ability to restrain themselves[. Y]ou want to see them understand why they did what they did and how they can prevent it, and when someone doesn't have a lot of what we call insight into that, that's a concern.

At trial, Browning confirmed this lack of insight when he asserted that he did not know why he had sexually assaulted Betty.

Dr. Mauro, on the other hand, credited Browning with having "pretty good" insight:

> Q. Okay. So just looking at his treatment, and we'll end here, do you believe that he has good insight into his offending history?

22

A. I think it's pretty good. You know, despite the limited actual opportunity he's had to engage in sex offender treatment due to various issues, lockdowns, and all of those that he can't control. And, I mean, his intellectual capacity and education, I think his insight is actually pretty good.

Q. Do you believe he's fully taken responsibility for his offending?

A. Fully? You know, if we're going to give it, you know, a hundred percent, I don't know if he would be missing a few points there, but he -- comparatively speaking, yes, he takes very good responsibility. I -- I don't know if you can say a hundred out of a hundred. I don't know.

Q. You would agree that he still engages in victim blame, for example, [Betty]?

A. Just -- just with [Betty]. And it's -- it's not completely inconsistent with some of [Betty's] own statements, but certainly I think he still accepts that he was in the wrong. He was her father. He was older. He should have not done it.

Q. [Betty's] statements, you would agree that she said that he psychologically coerced her, said that he was going to rape her sister if she didn't have sex with him, right?

A. Yes, she said that.

Q. That he told her, you're going to do it my way, when she tried to resist him?

A. She said that.

Q. Okay. So how is that inconsistent? Like, would you agree that that's a sexual assault?

A. I didn't say it wasn't. You asked if he was perhaps not doing some -- if he was perhaps doing some victim blaming in [Betty's] statements, and [Betty] did say that there were -- there were times where

23

she, you know, went along, didn't resist, and didn't say anything, that she participated.

Q. Okay.

A. That doesn't make it right and it doesn't make it consensual . . . .

### (5) Pedophilic Disorder

Another example of Dr. Proctor's and Dr. Mauro's viewing the same evidence but drawing different conclusions was in determining whether Alice was prepubescent for purposes of diagnosing whether Browning had a pedophilic disorder. Dr. Proctor assumed that Alice was (but acknowledged that he did not know for certain), so he concluded that Browning had a pedophilic disorder.

In contrast, Dr. Mauro entertained the possibility that Alice was not prepubescent and, for purposes of diagnosing Browning, concluded that Alice was not. Dr. Mauro explained, "[Alice is] a child in the eyes of the law, a legal minor, but not clinically a child, so she doesn't count."

Dr. Mauro also questioned the lack of duration of Browning's sexual interest in children. She explained, "There's usually a stronger interest in children, and we would see that through more child victims, perhaps through possession of child pornography, perhaps through in prison you might continue to see them keeping pictures of children, writing, like, sexually deviant stories about children." Dr. Mauro did not think that Browning met the criteria for pedophilia.

24

### (6) Indicia of Sexually Sadistic Behavior

Based primarily on the sexual assault on Cathy, Dr. Proctor thought that Browning's conduct suggested sexual sadism, which he defined as "being sexually aroused by causing pain [or humiliation] to another person." Dr. Proctor did not, however, expressly diagnose Browning as a sexual sadist but assigned this diagnosis a "rule-out" qualifier, which meant that "it's something that needs to be considered and that I have considered diagnosing but . . . stopped short of."[9] Dr. Proctor thought that Browning exhibited force with Alice and Betty—more so with Betty—but that the indications of sexual sadism were not clear-cut.

Dr. Mauro also found indicia of sexual sadism, but she discounted its significance:

Q. Okay. And you found no evidence of sexual sadism?

A. No. There was evidence to the extent that I discussed. I considered it in that one -- one offense where he used more force than was required to commit an act of rape.

Q. And he also made statements about wanting to humiliate her and degrade her?

A. Correct.

Q. And do you recall seeing during his deposition where he said he was aroused by that humiliation? Was that in a deposition or with you?

---

[9]*See In re M.M.*, No. 02-18-00337-CV, 2019 WL 1575394, at *6 n.4 (Tex. App.—Fort Worth Apr. 11, 2019, no pet.) (mem. op.) ("A 'rule[-]out' diagnosis is a working diagnosis or one that cannot be diagnosed from a single visit.").

A.  Yes.

Q.  But yet all of his offending is just simply opportunistic?

A.  I don't -- yes.

### (7)  Substance-Abuse Issues

Browning reported to Dr. Proctor that he had a significant problem with alcohol when he was younger and that he had a history of using marijuana, pills, and stimulants like cocaine and methamphetamine.  Dr. Proctor acknowledged that drugs and alcohol were still available in prison but getting them—Dr. Proctor asserted—was difficult.  To Dr. Proctor's knowledge, nothing suggested that Browning was using drugs in prison, so Dr. Proctor listed any alcoholism or drug addiction as "in remission."  Dr. Proctor cautioned, though, that "[i]t can be very different if you're in a . . . world where it's much more accessible."  Dr. Proctor noted that Browning had admitted that he was under the influence during his sexual offenses.

Dr. Mauro gave comparable testimony, that is, that Browning had a substance-abuse disorder.  Because Browning had been in prison for about thirty years, she did not think that substance abuse was a current problem for him.  Dr. Mauro took the position that because drugs and alcohol were available in prison, if Browning had wanted them, he could have gotten them.  Like Dr. Proctor, Dr. Mauro provided a caveat:

> Additional protective factors would be that [Browning's] been in -- in remission from his substance use for a long time.  However, I do need to highlight that if he did become intoxicated or under the influence of

26

drugs in the future, that in his specific case I would anticipate that would increase his risk. But right now he does seem to be in remission.

The jury did not have to rely strictly on Dr. Proctor's or Dr. Mauro's testimony about drugs and alcohol in prison. Browning spoke of his first-hand experience. Browning did not dispute that getting drugs and alcohol in prison was not difficult. He stated, "I can go anywhere on my block and get K2, weed, ICE, meth, wine. I can get anything I want in the penitentiary because it's there." Despite the availability of drugs and alcohol, Browning asserted, "I've never had a case, never one."

When asked if he had ever used drugs, Browning responded, "I'm a recovering addict." He said that when he sexually assaulted Cathy, he was on an acid trip. When offending against Alice, Browning said that he was under the influence of "[w]eed." But he denied being under the influence of alcohol or drugs when he sexually assaulted Betty. When asked why he would have told Dr. Proctor differently, Browning explained why he was not under the influence and expressed confusion:

Q. You're saying you were not?

A. We -- we had just moved to Bridgeport and Boyd. I didn't know no dope fiends. I didn't know no drug addicts. I didn't know no dope sellers.

Q. So you're saying you didn't know anyone. But were you under the influence of drugs or alcohol?

A. I did not know anybody in Wise County to buy dope from.

Q. So have you ever reported differently?

A. If I have, I don't remember it.

27

Q. Okay. So you don't remember telling Dr. Proctor that you were high on marijuana?

A. If I did, I did, but I don't remember saying that because I didn't know anybody in Boyd, Texas, Bridgeport to buy any dope from. We had just moved up here.

### (8) Impetus for Committing the Offenses

Dr. Mauro described Browning's offenses as "opportunistic offending." She also questioned whether Browning's behavior issues from thirty years ago persisted today. The following exchange illustrates Dr. Mauro's thinking:

A. I didn't -- I didn't say there's no -- no concern about him reoffending, and I certainly don't apply opportunistic [offending when determining risk]. I don't think opportunistic offending and no risk are synonymous at all. But in his specific case, looking at all the variables that we discussed this morning and, I guess, into this afternoon, looking at all of those details together, I don't think that his opportunistic offending and the other details of the case relates to a diagnosis or --

Q. And with [Betty], you thought that was opportunistic as well?

A. Yes.

Q. Even though one of the first conversations they ever had when they were reintroduced to each other, he was asking her about her virginity; do you recall seeing that?

A. She said that. I don't know if that's fact or not.

Q. Do you recall saying during your deposition that he was not -- or I'm sorry -- he wasn't in much control of his impulses at the time or he just disregarded the consequences?

A. Yes.

Q. Would you agree that that is evidence of difficulty controlling behavior?

28

A. It could be, but that's 30 to 40 years ago. I don't think that that exists today.

Q. You'd agree that literature shows that sexual deviance is a chronic condition?

A. Yes. I mean, some disorders can remit.

Q. But for Mr. Browning, we're not concerned about that chronicity?

A. Well, I don't think he has a paraphilia.

Q. You don't think he's sexually deviant?

A. No. He's committed illegal sexual offenses.

As with Dr. Mauro's other testimony, she acknowledged Browning's conduct; she just did not think that his conduct translated into "a behavioral abnormality that [made him] a person likely to engage in a predatory act of sexual violence." *See* Tex. Health & Safety Code Ann. § 841.003(a).

### d. Conclusion

Ultimately though, a reasonable factfinder could have credited the disputed evidence in favor of the sexually-violent-predator finding. While Browning faults aspects of Dr. Proctor's testimony, even if the jury found portions of Dr. Proctor's analyses unpersuasive, the jury could have nevertheless found his overall analysis correct. *See Kirkpatrick*, 862 S.W.2d at 772.

The undisputed facts supported rather than undermined the finding. No one disputed that Browning's offense against Cathy was violent or that his other two

29

sexual offenses involved children under the age of seventeen, both of whom were persons that Browning should have protected rather than exploited. No one disputed that Browning had committed the offense against Cathy after serving time in prison and completing a period of mandatory supervision or that he had committed the sexual offenses against Alice and Betty while on mandatory supervision for the sexual offense against Cathy. Nor was it disputed that Browning had two sexual misconduct cases while in prison. The dispute was over what it all meant.

Dr. Mauro came to a different conclusion than Dr. Proctor, but a rational jury could have found (and the jury by its verdict did find) her analysis suspect, especially when juxtaposed to Dr. Proctor's. *See id.* A rational jury could have concluded that Dr. Mauro had consistently given Browning the benefit of any doubt, and that ultimately could have undermined her overall credibility.

The factfinder could thus have found beyond a reasonable doubt that (1) Browning is a sexually violent predator; (2) Browning had serious difficulty controlling his behavior at the time of trial; and (3) Browning suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Because the statutory elements were met, the evidence was therefore factually sufficient.

We overrule Browning's first issue.

**B. Limitation of Examination of the Venire Panel**

In Browning's second issue, he contends that the trial court reversibly erred by limiting his examination of the venire members regarding their capacity to afford him a fair trial in a case involving a child victim. We view Browning's second issue as consisting of two components: (1) whether the trial court properly sustained the State's objection to Browning's question, and (2) whether the trial court thereafter precluded Browning from pursuing a valid line of similar questioning. *See Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 755, 758 (Tex. 2006) (addressing the "question" in part V of its analysis; addressing "[f]urther [q]uestions" in part VI of its opinion). The State responds that Browning did not preserve error, and even if he did, the State argues that the "trial court's ruling was guided by controlling law."

**1. The Record**

During the voir dire examination of the venire panel, Browning's trial counsel said: "So, I'm asking you is this the right case for you? And we can't go into the details, but, for example, if you were to hear that there's a victim that is related to this case -- you're going to hear some evidence about a victim who is a child." The State's attorney objected that Browning was asking a commitment question, and the trial court sustained the State's objection. Thereafter, Browning's trial counsel did not attempt to rephrase the question but, instead, moved on to another topic and never broached the subject of child victims.

## 2. Analysis

If the trial court erred by sustaining the objection, error is preserved as to that specific question. *See In re Commitment of Hill*, 334 S.W.3d 226, 228–29 (Tex. 2011) (reversing judgment after the trial court unilaterally prohibited defense counsel from asking "whether [the] potential jurors could be fair to a person they believed to be a homosexual" and asserting that "the questions [defense counsel] asked were proper, and there was no need for him to rephrase because there were no defects for him to cure"); *In re Commitment of Kalati*, 370 S.W.3d 435, 441 (Tex. App.—Beaumont 2012, pet. denied) (reversing judgment after the trial court improperly sustained the State's commitment objection; stating that the "question . . . was probative of the potential jurors' prejudices towards persons diagnosed with pedophilia[] and [that] the question . . . did not ask the [venire] members . . . for their opinions about the strength of the evidence or suggest what weight they would give to the evidence of [appellant's] psychiatric diagnosis."). Accordingly, we must first determine whether the trial court abused its discretion by sustaining the State's objection.

### a. Applicable Law

The primary purpose of voir dire is to inquire about the venire members' specific views that would prevent or substantially impair them as jurors from performing their duty in accordance with their instructions and oath. *Hyundai Motor Co.*, 189 S.W.3d at 749. Additionally, trial courts should allow the parties broad latitude to discover any bias or prejudice by the potential jurors so that counsel may

intelligently exercise their peremptory challenges. *Id.* A difference exists, however, between (1) a question that probes the venire members for biases and prejudices and (2) a question that probes the venire members to determine how they will vote on a specific factual issue in a case. The latter is an improper commitment question. *See id.* at 747, 756, 757.

"Counsel may 'question jurors about bias or prejudice resulting from a societal influence outside the case,' . . . ." *In re Commitment of Barnes*, No. 05-19-00702-CV, 2020 WL 4499795, at *6 (Tex. App.—Dallas Aug. 5, 2020, pet. denied) (mem. op.) (quoting *Hyundai Motor Co.*, 189 S.W.3d at 753). But a commitment question tries to "bind or commit a prospective juror to a verdict based on a hypothetical set of facts." *Id.* (quoting *Standefer v. State*, 59 S.W.3d 177, 179 (Tex. Crim. App. 2001)). "Commitment questions 'require a venireman to promise that he will base his verdict or course of action on some specific set of facts before he has heard any evidence, much less all of the evidence in its proper context.'" *Id.* (quoting *Sanchez v. State*, 165 S.W.3d 707, 712 (Tex. Crim. App. 2005)). A three-part test determines whether a voir dire question is an improper commitment question. *Id.* "First, is the question a commitment question? Second, if so, is it proper? Third, does the question contain only the facts necessary to test whether a prospective juror is challengeable for cause?" *Id.* (citing *Standefer*, 59 S.W.3d at 179–82).

### b. Standard of Review

Appellate courts use an abuse of discretion standard when reviewing a trial court's ruling limiting voir dire questions. *See Hyundai Motor Co.*, 189 S.W.3d at 747. A trial court abuses its discretion if it acts arbitrarily, unreasonably, and without reference to guiding principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997). In the context of questions posed to the venire panel, the supreme court wrote,

> Permitting disclosures about the evidence the jury will hear during the case increases the potential for discovering external biases, but inquiries to jurors after doing so should not spill over into attempts to preview the verdict based on the facts as represented to the jurors. Balancing these competing concerns depends on the facts in a case and on the inquiries posited to the jury. The trial judge is in a better position to achieve the proper balance.

*Hyundai Motor Co.*, 189 S.W.3d at 755.

### c. Application

#### (1) Commitment Question

During voir dire, Browning's trial counsel said, "So, I'm asking you is this the right case for you? And we can't go into the details, but, for example, if you were to hear that there's a victim that is related to this case -- you're going to hear some evidence about a victim who is a child." Knowing the case involved a child victim could—for some prospective jurors—both determine and stop the analysis regardless of any other evidence. *See Barnes*, 2020 WL 4499795, at *6–7. Determining and stopping the analysis based solely on the fact that the case involved a child victim, regardless of any other evidence, would give rise to a valid challenge for cause. *Id.*

34

And the question was not limited to only those facts necessary to test for potential bias or prejudice but, instead, injected the additional fact that the jurors would be hearing evidence of a child victim. *See id.*

Consequently, because Browning's counsel prefaced the question with "you're going to hear some evidence about a victim who is a child," the trial court could have concluded that counsel was probing the venire members for how they would vote on a specific factual issue in the case. *See Hyundai Motor Co.*, 189 S.W.3d at 757–58. Thus, under these circumstances, the trial court did not abuse its discretion by determining that the inquiry was an improper commitment question and by refusing to allow it. *See id.*

Browning cites numerous cases for the proposition that the question his counsel asked was not an improper commitment question. Much depends, however, on how the question was asked, and in each of Browning's examples, the questions lent themselves to inquiries exploring for external biases and unfair prejudices rather than questions testing the venire members' possible verdicts based on case-specific relevant evidence. *See, e.g.*, *Hill*, 334 S.W.3d at 228–29 (holding that the trial court committed reversible error by not allowing defense counsel to question the venire members about whether they could be fair to a person whom they believed to be a homosexual); *Barnes*, 2020 WL 4499795, at *6–8 (holding that "if" questions regarding child victims and pedophilia were proper, so the trial court should not have sustained the State's commitment objections, but further holding that the trial court did not

35

abuse its discretion because defense counsel made comparable follow-up questions to which the State did not object); *In re Commitment of Wiley*, No. 06-18-00056-CV, 2019 WL 490142, at *1–4 (Tex. App.—Texarkana Feb. 8, 2019, no pet.) (mem. op.) (holding that the trial court's refusal to allow defense counsel to ask "if" questions about elderly victims constituted reversible error); *In re Commitment of Porter*, No. 11-18-00015-CV, 2018 WL 6544751, at *1–2 (Tex. App.—Eastland Dec. 13, 2018, no pet.) (mem. op.) (holding that the trial court committed reversible error by prohibiting defense counsel from asking venire members whether they would feel uncomfortable hearing evidence about bestiality and, if so, whether that would impact their ability to be fair and impartial); *In re Commitment of Miller*, No. 09-11-00450-CV, 2012 WL 3031160, at *1–3 (Tex. App.—Beaumont July 26, 2012, pet. denied) (mem. op.) (holding that the trial court committed reversible error by prohibiting defense counsel from asking the following two questions: "(1) 'Can you set aside any bias if you find there's an offense against a child?  Can you listen to all the evidence and follow the law?' or (2) 'Is anyone unable to hear topics about children?  Can you listen to the evidence and follow the law?'"); *Kalati*, 370 S.W.3d at 440–41 (holding that the trial court committed reversible error when it refused to allow defense counsel to ask the venire members, "Would anybody on the first row find it hard to give someone who has been diagnosed by an expert as a pedophile a fair trial?").

36

Admittedly, at times, determining whether a question falls on one side of the line or the other can be troublesome. The Texas Supreme Court, however, has addressed that issue:

> The Texas Constitution guarantees a trial by a fair and impartial jury, and our courts use voir dire to achieve that goal. Voir dire inquiries that explore external biases and unfair prejudices further the effort, but those that test jurors' possible verdicts based on case-specific relevant evidence detract from it. The distinction between the two in some cases is a fine one. Thus, we vest trial judges with the discretion to decide whether an inquiry constitutes the former or the latter; as appellate courts, we should defer to their judgment.

*Hyundai Motor Co.*, 189 S.W.3d at 760. On this record, we defer to the trial court's ruling.

### (2) Browning's Other Arguments

Browning, however, further complains that the trial court gave the State "a full opportunity to thoroughly indoctrinate the venire panel about children as sexual-assault victims before the venire panel was turned over to Browning's trial counsel for further questioning on the very same topic." To support this argument, Browning provides three examples. Browning's three examples, however, fail to support his argument.

In the first example, the State said, "So I'm just going to ask you -- sometimes these cases involve child victims; sometimes they involve strangers; males; females; incest . . . ." Here, the trial court could have reasonably determined that the State was probing for biases or prejudices should the case involve a child victim. *See id.* at 754–

37

55. The State did not assert that the case, in fact, involved a child victim, and thus it was not asking the venire members to reveal how they would vote on a fact issue ahead of the trial itself. *See id.*

The second example involved an exchange between the State and one venire member:

> [State:]  I just want to make sure we're on the same page.  So if you hear about a certain diagnosis or a specific victim, are you saying that you will not be able to give Mr. Browning a fair trial?
>
> Prospective Juror:  I think it would be extremely hard, yes, if it was a child.
>
> [State:]  . . . .
>
> If it's a child it's difficult, right?  . . . .
>
> . . . .
>
> [State:] . . . . Okay?  It is difficult.  It is hard.  What I'm asking you is knowing that it's difficult, knowing that it's hard and we're asking a lot of you here, are you just done; can't do it?  That's what I need to know.

Once again, the trial court could have reasonably concluded that the State was asking whether the involvement of a child would prevent the venire member from giving Browning a fair trial. *See id.*  When asked in that manner, the question was designed to disclose any biases or prejudices.

And in the third and last example,

> [State:] I just need to make sure that, you know, if opposing counsel asked you these questions, we already have an idea of what's going on.  So if you hear that [pedophilia] diagnosis or you hear there's child victims or other kind of extremely vulnerable victims, I need to know

have you already made up your mind or are you okay understanding that's a piece of the puzzle but you still have a lot of evidence to hear.

Okay. So is everyone here who hasn't already spoken to me -- are you okay at this point to give Mr. Browning a fair trial?

As with the other two examples, the trial court could have reasonably deduced that the State was probing for biases and prejudices. *See id.*

### (3) Preclusion of Proper Line of Questioning—Not Preserved

To preserve error when complaining about a trial court's purported foreclosure of a proper line of questioning, it is not enough that the trial court sustains an opponent's objection to a particular voir dire question; the proponent must follow up with other questions: "When the trial court determines that a proffered question's substance is confusing or seeks to elicit a pre-commitment from the jury, counsel should propose a different question or [a] specific area of inquiry to preserve error on the desired line of inquiry . . . ." *Id.* at 758. Explaining further, the supreme court wrote, "Counsel does not have to present a list of questions to preserve error, but after the trial court's ruling sustaining [the opponent's] objection to the one presented, it [is] incumbent on the [proponent] to request alternative approaches to avoid the problems the trial court was addressing by its ruling." *Id.* at 759. The court concluded, "We do not know whether the trial court would have allowed other sorts of inquiries had counsel presented their substance. We therefore hold that the record does not present a sufficient basis for review of the trial court's ruling foreclosing

further inquiry into" the proposed subject matter. *Id.* at 760; *see In re Commitment of Tesson*, 413 S.W.3d 514, 517 (Tex. App.—Beaumont 2013, pet. denied).

Here, after the trial court sustained the State's objection, Browning's trial counsel never broached the subject of child victims again. Further, he failed to make the trial court aware of the substance of "other sorts of inquiries" he wished to pursue. *See Hyundai Motor Co.*, 189 S.W.3d at 760.

We agree with the State that Browning has not preserved error on the portion of his second issue complaining about the trial court's precluding a proper line of questioning. For all these reasons, we overrule Browning's second issue.

## C. Exclusion of Expert's Testimony Regarding Legislative Findings

In Browning's third issue, he complains that although Dr. Mauro admitted relying on the legislative findings when making her decision, she was not allowed to articulate the substance of the legislative findings to the jury. The State responds that the trial court's ruling was not an abuse of discretion but was guided by controlling law and the Sexually Violent Predator Act.

### 1. Standard of Review

Appellate courts review a trial court's evidentiary rulings for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it acts without regard for guiding rules or principles. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

## 2. Application

Section 841.001 of the Texas Health and Safety Code, entitled "Legislative Findings," provides in pertinent part, "The legislature finds that a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence." Tex. Health & Safety Code Ann. § 841.001. Browning complains about the trial court's prohibiting his expert from "explaining how the legislative findings informed her opinion."

The Texas Supreme Court has rejected Browning's position: "This 'small but extremely dangerous group' language, contained in the Act's legislative findings, is not part of the statute's definition of 'sexually violent predator' and [is] not an element the jury was required to find." *See Stoddard*, 619 S.W.3d at 677; *see also In re Commitment of Stratton*, 637 S.W.3d 870, 886–87 (Tex. App.—Eastland 2021, no pet.). Because the "small but extremely dangerous group" language in the legislative findings is not part of the definition of "sexually violent predator," it is not an element that the jury is required to consider when determining whether the offender suffers from a behavioral abnormality and is, thus, not relevant. *See Stratton*, 637 S.W.3d at 887 (citing *Stoddard*, 619 S.W.3d at 677–78). Accordingly, a trial court does not—and the trial court here did not—abuse its discretion by limiting Browning's expert's testimony in this way. *See id.*

41

We overrule Browning's third issue.

## IV.  CONCLUSION

Having overruled Browning's three issues, we affirm the trial court's judgment.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  November 10, 2022